**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE**

RUSSELL HOAKS,

Plaintiff,

vs.

BENTON COUNTY SHERIFF'S
DEPARTMENT, and DONALD MUNSON,
in his individual capacity,

Defendants.

NO. 4:15-CV-18

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment, filed on February 21, 2017 (DE #31). For the reasons set forth below, the motion is **GRANTED IN PART AND DENIED IN PART.** The Clerk is hereby **ORDERED** to **DISMISS** the claim for damages against Defendant Munson in his individual capacity **WITH PREJUDICE.**

BACKGROUND

On March 5, 2015, Plaintiff Russell Hoaks ("Hoaks") filed a complaint against the Benton County Sheriff's Department ("Sheriff's Department") and Sheriff Donald Munson ("Sheriff Munson" or "Munson") in his individual capacity (together,

"Defendants"). Munson was a correctional officer with the Sheriff's Department. In 2014, both Munson and Hoaks ran for sheriff on the Republican ticket in the primary election. Hoaks lost to Munson. Munson went on to win the general election in November and, on his first day in office, he terminated Hoaks. Hoaks filed this 42 U.S.C. § 1983 action alleging that he was terminated in violation of the First Amendment.

Defendants have filed a motion for summary judgment claiming there are no genuine issues of material fact and they are entitled to judgment as a matter of law. Defendants argue that Hoaks held a policymaking position and his termination therefore did not violate the First Amendment. They further argue that he is unable to produce evidence that his termination was motivated by political activity, and that they had legitimate non-political reasons for terminating Hoaks. Additionally, Defendants argue that the Sheriff's Department must be dismissed because there is no basis for municipal liability under *Monell*. Finally, Sheriff Munson argues that he is entitled to qualified immunity. The instant motion is fully briefed and ripe for adjudication.


DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citation omitted).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Facts

Although no motions to strike have been filed, each party has argued that certain evidence must be excluded as hearsay. It is the function of the Court, with or without a motion to strike, to carefully review the evidence and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement. *See, e.g., Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, No. 04 C 5167, 05 C 2253, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, No. 03 C 2249, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F.Supp.2d 917, 920 n.1 (N.D. Ind. 2004). Individual objections will not be ruled upon, but the Court notes that, in ruling on a motion for summary judgment, it only considers evidence that would be admissible at trial. *See Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000).

Hoaks, a Republican, began working for the Benton County Sheriff's Department as a correctional officer in 2005. (Ex. A at 7; Ex. 2 ¶2.) He was employed under two Republican sheriffs: Sheriff Winchester and Sheriff Pritchett. (Ex. A at 9; Ex. 2 ¶1.)

The written description of Hoaks' position indicates that the duties of a corrections officer include but are not limited to the

following: admitting and discharging inmates, recording jail activities, patrolling the jail, verifying safety and security in the jail, making written reports of events, inspecting jail property, dispensing medication, maintaining supervision of the inmates, and enforcing rules and regulations in accordance with the standard operating procedures ("SOPs"). (Ex. 5.) Hoaks testified that correctional officers report directly to the Sheriff. (Ex. A at 11-12.) Although this fact is not material to the outcome of this case, the job description, however, states that a correctional officer is directly accountable to the Jail Commander, followed by the Sheriff. (Ex. 5.) Munson was the Jail Commander prior to his election to the position of sheriff. (Ex. 2, ¶2.)

Hoaks testified that correctional officers do what they see fit and what is necessary during their shifts, be it breaking up a fight or passing out envelopes and paper. (Ex. A at 40.) When Hoaks came to work, he "would take care of what was needed to be taken care of," and the sheriff only provided direction if they had transports or court. (*Id.*) It was only a matter of the sheriff calling them to arrange transport for the inmates. (*Id.* at 40-41.)

Hoaks won an election to the Oxford Town Council ("Council") in 2010, and he joined the Council in 2011. (*Id.* at 10-11.) He

has been on the Council since 2011. (*Id.* at 10.) He served on the Council with Munson from 2012-2014. (Ex B at 23.) Hoaks decided to run for the position of sheriff in 2014. (Ex. A at 11; Ex. 2 at ¶2.) Hoaks, Munson, Ernie Winchester ("Winchester"), and Matt Shuee ("Shuee") ran for sheriff in the Republican primary in 2014. (Ex. B at 19; Ex. 2 ¶2.) Other than Munson, Hoaks was the only candidate who worked at the Benton County Sheriff's Department. (Ex. 2, ¶4.) Munson's campaign slogan was "Time for Change." (Ex. 6 at 20.)

Hoaks' working relationship with Munson was very cordial and there was nothing out of the ordinary when they saw each other. (Ex. A at 41.) Although Munson won the election, this relationship did not change after the election. (Ex. A at 41; Ex. 2, ¶4.) Hoaks and Munson did not discuss the election at work. (Ex. B at 23.) The only discussion was the day before or day of the election when the two wished each other good luck. (*Id.*) Shuee's wife, Mary, still works for the Benton County Sheriff's Department, and Munson promoted her to matron over the kitchen. (*Id.* at 19-20.) The election did not enter the work arena because they kept it clean. (*Id.* at 91). They were able to compartmentalize where they might be at odds, and their job was their job. (*Id.*)

Munson decided to run for the position of sheriff because that was the only way to have any control over change in the

direction the Sheriff's Department was going. (*Id.* at 20.) He believed the Sheriff's Department needed a change in direction. (*Id.*) Munson won fifty percent of the primary vote, Winchester won twenty-three percent, Hoaks won seventeen percent, and Shuee won ten to eleven percent of the vote. (*Id.* at 20-21.) Munson believed that Hoaks was technically qualified under the law to run for Sheriff, but he does not think Hoaks would have done a good job as Sheriff. (*Id.* at 28.) Munson believed Hoaks would have served under the "good ole boy system," which he viewed as problematic. (*Id.* at 29.) Former Sheriff Pritchett believed in trying to appease the inmates the best he could. (Ex. C at 38.) It did not bother Munson that Hoaks ran, as he did not believe Hoaks was a threat to his campaign. (Ex. B at 29.) Nonetheless, Munson made comments to Sheriff Pritchett such as "why does he think he's got to run" during the primary season. (Ex. 3. at 22-23.) Furthermore, Timothy Piercy ("Piercy") overheard a conversion in May of 2014 between Munson and Bruce Buchannan, the Lead Chair of the Republican Party in Benton County. (Ex. 7 ¶¶3-5.) In that conversation, Munson indicated that, as sheriff, he would "clean house" and that Hoaks would be the first to go. (*Id.* ¶6.)

Hoaks was aware that an employee previously received a three-day suspension for passing contraband. (Ex. A at 10.) The

employee passed a cell phone and cigarettes. (*Id.*) Hoaks believes sometimes he needs to make an inmate think he got away with something because if he tells them no he will have a mess from them banging their head on the wall. (*Id.* at 34-35.) According to Hoaks, "[i]f giving him two Tylenol and telling him to not flash the camera keeps him on the down low, that's corrections officer 101." (*Id.* at 35.)

Munson believes that jailers and jail commanders are there to maintain the health and well-being of inmates, not to be friends. (Ex. B at 30.) He believed Hoaks decided he needed to be friends with the inmates. (*Id.*) They have personality differences on that basic level. (*Id.*)

On October 25, 2014, inmates Cody Adams ("Adams") and Greg Fultz ("Fultz") were in a physical altercation. (*Id.* at 31.) Adams was injured and transported by Munson. (Ex. 2 ¶8.) Fultz injured his left hand and was taken to Clarian Hospital. (*Id.*) Upon his return to the jail, Fultz was placed in isolation by Munson. (*Id.* ¶9.) While in isolation, inmates are not permitted to make phone calls. (*Id.*)

Hoaks explained that, the following morning, Fultz informed him that his girlfriend was scheduled to visit that afternoon and was coming from Lafayette. (Ex. 2 ¶9.) To save her the trouble of traveling to the jail when she would not be able to see Fultz,

Hoaks allowed Fultz to use the jail phone. (*Id.*) According to Hoaks, this was something that occurred regularly by the correctional officers. (*Id.*) Hoaks asserts that Fultz's injury required medical attention and Hoaks allowed Fultz to call his girlfriend to let her know and to see if she could arrange care. (*Id.*) During the phone call, Fultz told his girlfriend that he was not supposed to make the call but that Hoaks had let him, so after the call, Hoaks told Fultz that he was "throwing him under the bus." (Ex. 1 at 34; Ex. 2, ¶9.) Hoaks claims that said this to allow Fultz to think he had one-up on him. (Ex. 2, ¶9.) Hoaks was aware they were being recorded and did not believe he was violating any rules. (*Id.*)

On October 29, 2014, Munson learned from Hoaks' partner, Lou Villinski ("Villinski"), that Hoaks provided Fultz improper phone privileges on October 26, 2014. (Ex. B at 35.) Munson reviewed the video footage regarding this incident on October 31, 2014. (*Id.* at 36.) Fultz told Hoaks that he wanted to use the phone, and Hoaks allowed him to use the admin phone instead of making him use a calling card on the inmate phone. (*Id.* at 36.) Munson believes that, during and before the phone call, Hoaks coached Fultz to tell his girlfriend to call the jail commander and Sheriff to put pressure on them to get Fultz out of jail in order to not pay for his hand injury. (*Id.* at 37.) Fultz also told his

girlfriend that he was not supposed to make his phone call, but Hoaks let him. (Ex. A at 34.)

On November 4, 2014, Munson brought the matter to Sheriff Pritchett's attention. (Ex. B at 38.) Sheriff Pritchett did not indicate an intention to discipline Hoaks for the phone call incident, although Pritchett did indicate that he would take care of it. (*Id.* at 39; Ex. 3 at 30.) Munson concedes that Sheriff Pritchett had no obligation to discuss any disciplinary matters with him. (*Id.* at 39-40.) However, he believed that, if Pritchett intended to discipline Hoaks, he would have discussed it with him. (*Id.*) That is what occurred in the past. (*Id.*) Munson did not press the issue of discipline for Hoaks further with Sheriff Pritchett. (*Id.* at 40.)

Later that day, Munson spoke with Villinski again, and she asked if Munson viewed the video. (*Id.* at 41.) Munson advised that he reviewed the video about the phone call, and Villinski asked about the pills Hoaks gave Fultz. (*Id.*) Munson was previously unaware of a separate incident with pills, and Villinski advised that the incident occurred around 10:00 a.m. on October 26, 2014. (*Id.*) She believed that Hoaks provided Fultz with pills, but she did not think Fultz had anything prescribed. (*Id.*)

The next day, Munson reviewed the video, and he observed Hoaks in the nurse's office digging around searching for something.

(*Id.*)  When Hoaks went to the cell, Fultz said something about needing Norcos, and Hoaks handed him something and said to take these four and don't flash them in front of the camera.  (*Id.* at 42.)  There was nothing that the jail medical provider had prescribed Fultz for pain at that point.  (*Id.*)  He was not prescribed ibuprofen until days later.  (*Id.* at 43.)  Munson reviewed the medical chart to make sure there had been no medication prescribed or logged for October 26, 2014.  (Ex. B at 44; Ex. 2 at ¶10.)  Anker reviewed her documentation, which reflected that no medical slip had been turned in.  (Ex. D at 11.) The medical chart does not reflect an order for Ibuprofen until October 29, 2014.  (Ex. E.)

Hoaks admitted that at the time he provided the medication and phone privileges to Fultz, he was aware that doing so may violate the department policies.  (Ex. A at 12-13.)  Correctional officers are forbidden from passing medication to inmates without permission.  (Ex. C at 6.)  According to Renee Anker ("Anker"), medication provided to inmates must be cleared by medical and written on the chart, or it should not be given.  (Ex. D at 10.) At some point in 2013, the policy changed to allow correctional officers to provide Tylenol and ibuprofen without medical approval.  (Ex. 2 at ¶10; Ex. 3 at 8-9.)  The medications were still supposed to be logged.  (Ex. 2 at ¶10; Ex. 3 at 8-9.)

Approximately three or four times a year, a correctional officer would forget to log medication given to an inmate. (Ex. 8 at 17-18; Ex. 4 at 26-27.) Munson's mother, Sharon Vanderwall, was one of the employees that forgot to log medication. (Id.) Marylou Shuee also forgot to log medication. (*Id.*) Hoaks did not have a history of failing to log medications. (*Id.* at 27.) In Sheriff Pritchett's words, "you don't fire somebody for that." (*Id.* at 27.) Ibuprofen and Tylenol can be purchased by prisoners from the commissary. (Ex. 8 at 6-7.)

At the time the events of October 26, 2014, were revealed to Munson, he had already won the general election, and he knew that he would become Sheriff on January 1, 2015. (Ex. B at 44.) Based on Sheriff Pritchett's reluctance to discipline Hoaks for obvious signs of fraternization and trafficking, Munson decided in early November to terminate Hoaks once he became Sheriff. (*Id.* at 44-46.) Munson considered Hoaks' actions to be worthy of termination. (*Id.* at 91.) The series of incidents combined made it easier to make the determination that Hoaks should be terminated because it showed a pattern of behavior. (*Id.* at 92.) Munson had only discussed the phone incident with Sheriff Pritchett, and he did not reconvene with Sheriff Pritchett after learning about the pills because he decided to take care of the issue when he became Sheriff in January. (*Id.* at 46.)

Munson believed that Hoaks had been doing a lot of things with inmates that he should not be doing besides the events of October 26, 2014. (*Id.*) Munson believed Hoaks was engaging in improper conversations and providing extra privileges and extra information. (*Id.* at 47.) To Munson, it went back to his campaign slogan that it was time for change. (*Id.*) Munson did not have proof of Hoaks' misconduct prior to October 26, 2014. (*Id.* at 49.) According to Munson, Hoaks did whatever he wanted to do. (*Id.* at 54.) By fraternizing, Munson meant that Hoaks was being friends with the inmates. (*Id.*) According to Munson, he was giving them favors and letting them do things he should not be letting them do. (*Id.*) He was, in Munson's opinion, doing things not normal to his job based on his feelings about the inmates. (*Id.*) He has no idea what medication Hoaks actually provided Fultz, but he gave him pills in order to do something nice as a friend, not as a jailer. (*Id.* at 55.) In Munson's estimation, Hoaks' conduct was harmful to the safety and security of the jail. (*Id.* at 99.) When inmates become too close with correctional officers, they try to gain information about inmate movement which can be used to coordinate an escape. (*Id.* at 98.)

According to former Sheriff Pritchett, "just about every jailer back there, including [Munson's] own mother" allowed inmates to use the jail phone. (Ex. 3 at 28-29.) While this

13

violated the jail's policies, Sheriff Pritchett did not view this as an offense worthy of discipline, and he did not discipline Hoaks for allowing Fultz to use the jail phone. (*Id.*)

Sheriff Munson and Deputy Sallee delivered a notice of termination to Hoaks at his home on the first day Munson took office. (Ex. 6 at 51-52.) The notice informed Hoaks that he was being terminated for policy violations. (Ex. F.) The notice indicates that Hoaks is being discharged for disclosing confidential information and fraternizing/conspiring with an inmate on October 26, 2014. (*Id.*) The attached report explains that Hoaks was being terminated based on the phone call and the improper providing of medication. (*Id.*) The notice specifically notes that Hoaks' familiarity with the inmates represents a clear risk to the department. (*Id.*) When Sheriff Munson arrived at Hoaks' home to deliver the notice, Hoaks saw that the notice alleged "fraternization," and, because of this allegation, he asked if he was being arrested. (Ex. A at 37; Ex. B at 52; Ex. 2, ¶13.) Hoaks observed that the word fraternization with inmates in a jail setting means you are playing with something you should not be. (Ex. A at 37.)

Prior to October 2014, Hoaks had not received any discipline. (Ex. 2 at ¶3.) On October 29, 2014, Sheriff Pritchett issued a written reprimand. (*Id.* ¶11; Ex. 4.) The reprimand was issued

solely because Hoaks failed to log the medication, not because he provided unauthorized medication. (Ex. 3 at 26; Ex. 4.) The reprimand stated:

> On October 28, 2014 the Benton County Jail Nurse (Renee) reported to me that the medication was not being logged on inmate's medical log. Renee advised that Rusty Hoaks had failed to log ibuprofen that he gave to Greg Fultz.
>
> On October 29, 2014 I had a meeting in my office with correctional officer Rusty Hoaks. This meeting was of two fold. First I wanted a review of the fight that had taken place between inmates Greg Fultz and Cody Adams. CO Hoaks reported that the fight had broken out between the two and Adams had required several switches [sic]. Fultz appeared to have broken his hand. . . .
>
> I asked Hoaks if he had given Fultz any medication. Hoaks advised that he had given Fultz two ibuprofen in the morning and two again that evening according to medical protocol. I then asked Hoaks why he didn't log the medication in Fultz's medical sheet. Hoaks stated that it was his oversight.
>
> Hoaks went on to explain that he had let Fultz use the jail's phone. Hoaks advised that Fultz could not get through on the inmate phones to call his girlfriend. Hoaks advised that Fultz wanted to be ORed so he could have his hand looked at sooner. Hoaks advised Fultz that the Jail Commander would have to take care of that. Hoaks advised Fultz to have his girlfriend call the Jail Commander in the morning and see what he could do about getting him Ored. Since Fultz couldn't get through on the inmates phone, he let Fultz use the jail phone.

(Ex. 4.)

Thus, at the time of his termination, Hoaks had already been disciplined for his conduct by then Sheriff Pritchett. (Ex. 3 at 11; Ex. 4.) Munson never asked Hoaks about the Tylenol incident.

(Ex. 2, ¶11.) Hoaks has no knowledge as to whether or not the statement that he was terminated for policy violations is true. (Ex. A at 61.) Hoaks has told people that he was terminated because of a change in sheriff and that he was let go by the new sheriff for reasons he did not understand. (*Id.* at 48-49.) Hoaks never heard comments from Munson regarding an intent to terminate him. (*Id.* at 26.) Hoaks was never present when it appeared Munson was talking about him to someone else. (*Id.*)


ANALYSIS

### Position Subject to First Amendment

Defendants argue that Hoaks' First Amendment claim fails because his position was exempt from the First Amendment's ban on patronage dismissals. Generally, "public employees may not be made to suffer adverse job actions because of their political beliefs." *Carlson v. Gorecki*, 374 F.3d 461, 464 (7th Cir. 2004) (citations omitted).

> The Supreme Court has held in the name of freedom of speech that a public official cannot be fired on the basis of his political affiliation unless the nature of his job makes political loyalty a valid qualification; this could be either because the job involves the making of policy and thus the exercise of political judgment or the provision of political advice to the elected superior, or because it is a job (such as speechwriting) that gives the holder access to his political superiors' confidential, politically sensitive thoughts.

*Riley v. Blagojevich*, 425 F.3d 357, 359 (7th Cir. 2005) (citing *Elrod v. Burns*, 427 U.S. 347, 367-68 (1976); *Branti v. Finkel*, 445 U.S. 507, 518 (1980)). In other words, "[p]olitical affiliation is an appropriate criterion for public employment when the effective operation of government would be compromised by requiring a public official to retain a potential political enemy in a position of responsibility." *Pleva v. Norquist*, 195 F.3d 905, 912 (7th Cir. 1999) (citation omitted). Ultimately, the defendant bears the burden of establishing that a plaintiff's position falls within the exception to the general prohibition on patronage dismissals. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 354 (7th Cir. 2005) (citation omitted).

The Supreme Court first articulated the test for whether political affiliation is an appropriate requirement for employment as whether a particular position involved confidential and policymaking responsibilities. *See Elrod*, 427 U.S. at 360. However, the Court has since recognized that "[u]nder some circumstances, a position may be appropriately considered political even though it is neither confidential nor policymaking in character," and that "party affiliation is not necessarily relevant to every policymaking or confidential position." *Branti*, 445 U.S. at 518. Thus, "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position;

rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.*

The test for whether a position is protected is "whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981). Even "if an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance." *Tomczak v. City of Chicago*, 765 F.2d 633, 641 (7th Cir. 1985). As this Court noted in *Harney v. McDermott*, No. 2:04-cv-131, 2006 WL 1544389, at *7 (N.D. Ind. June 2, 2006), "[w]hile the law is clear, its application has been fraught with difficulty." *See also Riley*, 425 F.3d at 359 (noting that drawing the line between protected and unprotected positions is "inescapably arbitrary"); *Nekolny*, 653 F.2d at 1169 (finding the question of whether an employee has policymaking powers "in many cases presents a difficult factual question"). The question of whether a position is exempted from the First Amendment patronage

dismissal ban is typically a factual one that should ordinarily be left for a jury to determine. *Pleva*, 195 F.3d at 912. Only in limited cases where the duties and responsibilities of a particular position are clearly outlined in an official job description may a court make such a determination as a matter of law. *Id*.

Defendants rely on two cases in support of their argument that Hoaks held a policymaking position: *Flenner v. Sheahan*, 107 F.3d 459 (7th Cir. 1997), and *Upton v. Thompson*, 930 F.2d 1209 (7th Cir. 1991). In *Flenner*, the Seventh Circuit considered whether correctional officers were protected by the First Amendment. 107 F.3d 459. The district court had found that the sheriff had qualified immunity for his decision to terminate two correctional officers for patronage reasons. The Seventh Circuit reversed, noting:

> According to appellants, they received daily instructions from their immediate supervisors as to the handling, care and supervision of the prisoners to whom they were assigned. Accepting these allegations as true, it would appear that appellants are among those government workers who are clearly and completely protected from patronage firing. Dismissal of appellants' case on the pleadings was therefore inappropriate.
>
> Of course, on remand, the district court may be presented with evidence that the position of correctional officer involves more autonomy or discretion than is alleged in appellants' complaint. Once the factual record is developed, the district court may be required to revisit the qualified immunity issue.

*Id.* at 465 (internal citations and quotation marks omitted).

In *Upton v. Thompson*, the Seventh Circuit determined that two sheriffs were entitled to qualified immunity in their decision to terminate deputy sheriffs. 930 F.2d 1209 (7th Cir. 1991). The Seventh Circuit noted the following:

> Given the dependency of the sheriff (and his political survival) on his deputies' job performance, it is understandable why a sheriff might believe that party loyalty is an appropriate consideration for a deputy sheriff. This conclusion is especially true in the case of Jack Thulen, who was the outgoing sheriff's brother and chief deputy in a very small department for many years. Thulen took a high profile in a hotly contested campaign which involved critical policy disputes relating to the proper operation of the Sheriff's Department. Thulen's political involvement extended beyond mere party affiliation; it included active opposition to Marvin Bausman, who became the newly elected Sheriff. To the voting public this could make Thulen appear hostile and unreliable in carrying out the policies of the new Sheriff. Deputy Upton, while apparently not as active (or at least as high profile) in campaign events as Jack Thulen, had certainly made his opposition to candidate (later Sheriff) Thompson well known. In addition, Upton's leadership of a policemen's union which opposed Thompson's candidacy made it questionable whether he could execute Thompson's policies. Even though Thompson's department was larger, thus diluting the potential disruptiveness of one deputy's opposing political alignment, *Tomczak [v. City of Chicago*, 765 F.2d 633 (7th Cir. 1985),] and *Livas [v. Petka*, 711 F.2d 798 (7th Cir. 1983),] would still provide a reasonable legal foundation for the sheriff to terminate a deputy whom he concluded would interfere in carrying out his stated policies based upon that deputy's prior political activity. Thus it was not clearly established at the time of Upton's and Thulen's discharges that deputy sheriffs were protected from patronage firings under *Elrod* and *Branti*.

*Id.* at 1216.

Rather than support Defendants' position, the Court believes *Flenner* and *Upton* indicate that Hoaks' position was not one that authorized meaningful input into governmental decisions. The plaintiff-employees in *Flenner* and *Upton* held positions and responsibilities that differ from those held by Hoaks in the present case. Unlike those employees, the proffered evidence does not demonstrate that Hoaks had "meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny*, 653 F.2d at 1170. The Court does not believe that Hoaks' status as a correctional officer necessarily makes his position exempt from the prohibition against patronage dismissals, nor is it aware of any case law holding that any similar position is a *per se* policymaker as a matter of law. *See Hadfield v. McDonough*, 407 F.3d 11, 18 (1st Cir. 2005) ("[A]n employee is not protected merely because he is a subordinate within his own office. It is sufficient that an officeholder is responsible for implementing policies that derive from partisan decisions made by others.") (quotation marks and internal citation omitted).

In *Riley v. Blagojevich*, the Governor of Illinois had fired assistant wardens of Illinois state prisons who were "the top officials in an Illinois prison below the warden himself." 425

F.3d at 363. The Seventh Circuit explained that "[i]n general, employees who have merely ministerial duties - who really have very little discretion - and employees whose discretion is channeled by professional rather than political norms (a surgeon often exercises judgment, but it is professional rather than political judgment), are not within the exception for policymakers." *Id.* at 360. Recognizing the uncertainty of the case law in the Seventh Circuit, the *Riley* court concluded that elected officials could rely on official written job descriptions if the job description was reliable and authoritative. *Id.* at 360-61.

In examining the position, duties, and responsibilities of Benton County Jail corrections officers, the Court must view the undisputed facts in the light most favorable to the nonmovant because this case is before the Court on a motion for summary judgment. *See Anderson*, 477 U.S. at 255. The written job description for a corrections officer indicates that the officer's responsibilities included, but were not limited to, admitting and discharging inmates, recording jail activities, patrolling the jail, verifying safety and security in the jail, making written reports of events, inspecting jail property, dispensing medication, maintaining supervision of the inmates, and enforcing rules and regulations in accordance with the SOPs. (Ex. 5). The

tasks that Hoaks has described as part of his job as corrections officer are consistent with this job description. Hoaks had no power over employment decisions, did not have input into the budget, and his actions were constrained by the SOPs. *See Kiddy-Brown*, 408 F.3d at 355 (applying *Nekolny test* to find that state prison warden was not exempt from the general prohibition on political patronage dismissals where she had no autonomous or discretionary authority, did not participate in determining policy, and her responsibilities were constrained by statutes, regulations, and rules). Defendants have put forth no evidence that Hoaks had any input to policymaking or that his position afforded him meaningful input to Government decision-making. As in *Kiddy-Brown*, Defendants have not carried their burden to show that Hoaks is exempt from the general prohibition on political patronage dismissals, and have not presented the Court with evidence sufficient to allow it to conclude that Hoaks' position "involved the kind of policymaking duties that would make political affiliation an appropriate requirement for the position." *Id.* at 356. Therefore, the Court finds that a question of material fact exists as to whether Hoaks' position as Benton County Jail corrections officer was exempt from the First Amendment's ban on patronage dismissals.

<u>First Amendment Claim</u>

Defendants move for summary judgment on Hoaks' First Amendment claim. To make out a *prima facie* claim for a violation of First Amendment rights, a public employee "must present evidence that (1) his speech was constitutionally protected; (2) he suffered a deprivation likely to deter free speech; and (3) his speech was at least a motivating factor in the employer's actions." *Consolino v. Towne*, 872 F.3d 825, 829 (7th Cir. 2017)(citations omitted). "[T]he initial burden is on the plaintiff to demonstrate that his conduct was constitutionally protected and that his conduct was a substantial or motivating factor in the defendant's action against him. The burden then shifts to the defendant to show that it would have taken the same action even in the absence of the protected conduct." *Id.* (citations omitted). If the defendant is able to provide alternative explanations for its actions, the burden shifts back to the plaintiff to show that these explanations were pretextual. *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 314 (7th Cir. 2017). To show pretext and to survive summary judgment, a plaintiff must "produce evidence upon which a rational finder of fact could infer that the defendant[s'] proffered reason[s] [are] lie[s]." *Id.* (citation omitted).

The parties do not dispute that Hoaks' running for the position of sheriff was constitutionally protected conduct, or

that he suffered a deprivation likely to deter free speech. Hoaks
must prove that running for the position against Munson was a
motivating factor in the Defendants' decision to terminate him.
Hoaks relies on the suspicious timing of his termination – Munson's
first day in office as sheriff – as evidence that that running for
sheriff against Munson was a motivating factor in the decision to
terminate him. Hoaks also relies upon Piercy's attestation that
in May 2014, he overheard a conversion in which Munson indicated
that, as sheriff, he would "clean house" and that Hoaks would be
the first to go. (Ex. 7, ¶¶ 3-6.) Defendants maintain that this
statement makes no reference to Hoaks' political activity, and
that the term "clean house" tends to refer to ridding an
organization of problematic employees, which Munson believed Hoaks
to be. Defendants note that Munson and Hoaks kept the election
clean, and that their working relationship was very cordial. At
the summary judgment stage, the Court must consider the evidence
in the light most favorable to Hoaks. The Court finds that a
reasonable trier of fact could conclude that Hoaks' termination
politically motivated. *See, e.g., Foster v. Deluca*, No. 04 C
5850, 2006 WL 1980197, at *6 (N.D. Ill. July 7, 2006) (holding
that a question of fact remained as to whether plaintiff's
termination was politically motivated where he and other employees

who did not work on defendant's campaign were fired shortly after defendant took office).

Defendants argue that summary judgment is nevertheless appropriate because they have a legitimate nonpolitical reason for the decision to terminate Hoaks: Munson believed Hoaks to be a danger to the safety and security of the jail. Defendants proffer undisputed evidence that Hoaks provided inmate Fultz with improper phone privileges and medicine on October 26, 2014. At the time of this incident, Munson had been elected Sheriff, but had not yet taken office. Munson raised the incident with then-Sheriff Pritchett, who told Munson he would take care of it. Munson was not aware that Pritchett issued a written reprimand to Hoaks for the incident. Munson believed that Hoaks had also engaged in improper conversations and provided extra privileges and information to inmates, but did not have proof of Hoaks' misconduct before the October 26, 2014 incident. Before taking office, Munson decided to terminate Hoaks' employment based on what he perceived to be Sheriff Pritchett's reluctance to discipline Hoaks for obvious signs of fraternization and trafficking.

Hoaks argues that Defendants' explanation for his termination is pretextual because Sheriff Pritchett disciplined him for the October 26, 2014 incident before Munson took office. However, Hoaks makes no claim that Munson was aware of this discipline, and

therefore this argument "do[es] nothing to undermine the sincerity of [Munson's] reasons for firing him." *Massey*, 457 F.3d at 719. Hoaks contends that Munson's assertions that he was likely responsible for trafficking a wide range of inappropriate items to inmates within the jail and providing a variety of improper privileges are speculative, unsubstantiated and unsupported by evidence, and thus, should be disregarded by the Court. Hoaks also maintains that other correctional officers had engaged in similar conduct (*i.e.*, allowed inmates to use the telephone, or forgot to log medication), and were not disciplined or terminated. Hoaks notes that he had never been disciplined prior to this incident.

When Munson terminated Hoaks on his first day as Sheriff, he did not know that Hoaks had been disciplined for the October 26, 2014 incident. However, then-Sheriff Pritchett's discipline of Hoaks indicates that lesser forms of discipline were available. Moreover, the evidence suggests that other employees were not disciplined for similar misconduct. Munson insists that he terminated Hoaks because he believed that Hoaks was a danger to the safety and security of the jail. "It is rarely appropriate on summary judgment for a district court to make a finding on a state of mind." *McGreal v. Ostrov*, 368 F.3d 657, 677 (7th Cir. 2004) (citation omitted); *see Massey*, 457 F.3d at 719 (noting "the

persuasiveness of an employer's non-retaliatory explanation ordinarily is for the finder of fact to assess"); *Venters v. City of Delphi,* 123 F.3d 956, 973 (7th Cir. 1997) (holding a court should only grant summary judgment when it "can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point"). Construing the evidence in favor of Hoaks, a finder of fact could conclude that Sheriff Munson rejected lesser discipline in favor of termination because Hoaks had run against Munson, and that the proffered reasons were not the actual motivation for the discharge. Because a genuine issue of material fact exists as to whether Munson's termination of Hoaks violated the First Amendment, Defendants' motion summary judgment on Hoaks' First Amendment claim is denied. *See Yahnke v. Kane Cty., Ill.*, 823 F.3d 1066, 1072 (7th Cir. 2016) (reversing summary judgment where a fact finder could conclude that sheriff rejected lesser sanctions in favor of termination because plaintiff expressed a desire to run against the sheriff, and that the proffered reasons were not the actual motivation for the discharge).

### Municipal Liability

Defendants argue that Hoaks' claim against the Sheriff's Department must be dismissed because Hoaks has no evidence of any procedure, policy or practice that allegedly caused his

deprivation. A municipality may only be held liable for constitutional violations caused by the municipality through its own policy, practice, or custom. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). To recover under *Monell*, a plaintiff must establish that (1) he suffered a deprivation of a federal right; (2) as a result of an express municipal policy, a widespread custom, or a deliberate act of a decision-maker with final policymaking authority for the municipality; which (3) was the proximate cause of his injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). Hoaks does not argue that liability attaches due to a policy or custom. Rather, he argues that Sheriff Munson was a decision-maker with final policymaking authority.

"The determination of whether a person has policymaking authority is a question of state law, and is to be decided by the court." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) (citations omitted). "Officials with final decisionmaking authority are deemed policymakers for *Monell* purposes, and we need to look to state law to determine the scope of such authority." *Id.* at 676 (citations omitted). The Indiana Court of Appeals has found that the Sheriff is "a final policymaker." *Trout v. Bouie*, 653 N.E.2d 1002, 1007 (Ind. Ct. App. 1995). Defendants do not deny that Sheriff Munson was a

final decisionmaker.[1]  Rather, they argue that Munson's actions did not violate the First Amendment.  Because the Court has determined that a genuine issue of material fact exists as to whether Sheriff Munson violated the First Amendment when he terminated Hoaks, Defendants' motion for summary judgment on the *Monell* claim is denied.

Qualified Immunity

Sheriff Munson asserts the defense of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted).  "[Q]ualified immunity ensures that government officials had notice that their conduct was unlawful before enduring litigation." *Houlihan v. City of Chicago*, 871 F.3d 540, 546 (7th Cir. 2017) (citation omitted).  "These officials are thus entitled to some degree of certainty in the law." *Id.*  "Although the First

---

[1] In their reply brief, Defendants assert in passing that Hoaks' Complaint did not allege a *Monell* claim based on policymaker liability.  (DE #37 at 8.)  Defendants do not make any further argument or provide any additional explanation regarding this statement.  Such "[p]erfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived." *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) (citations omitted).

Amendment typically prohibits government employers from making politically motivated employment decisions, a court's qualified-immunity analysis cannot simply rely on this general principle; rather, the court must determine whether there was a clear violation in the specific context of the case." *Id.* (citing *Moss v. Martin*, 614 F.3d 707, 712 (7th Cir. 2010)). The plaintiff bears the burden of defeating a qualified immunity defense. *Betker v. Gomez,* 692 F.3d 854, 860 (7th Cir. 2012). "Although pointing to an analogous case is the typical way to defeat qualified immunity, *see Humphries v. Milwaukee Cty*., 702 F.3d 1003, 1006 (7th Cir. 2012), it's not necessarily the only way: 'if there is no such case, then [a plaintiff] needs to offer a different explanation for why the constitutional violation is obvious.' *Moss*, 614 F.3d at 712." *Houlihan*, 871 F.3d at 547.

Defendants argue that Sheriff Munson is entitled to qualified immunity because it was not clearly established that a Benton County correctional officer lacked discretion and policymaking authority in order to place Hoaks' termination under the First Amendment. "A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Carroll v. Carman*, 135 S. Ct. 348, 350, 190 L.Ed.2d 311 (2014) (citation and quotation marks omitted).

Given the "considerable uncertainty [that] exists in the area of patronage law," it is often difficult to prove that a government official violated a clearly established right by considering politics when making an employment decision. *Flenner v. Sheahan*, 107 F.3d 459, 465 (7th Cir. 1997). The reason for this uncertainty is that determining whether it is permissible to consider politics is a highly fact-specific inquiry—one that requires considering "a wide range of government positions, which in turn involve an endless variety of job responsibilities and varying degrees of discretion and autonomy." *Id*. Between the low-level government worker (who typically receives protection from patronage hiring and firing) and the confidential employee (who receives no such protection), there are numerous government positions for which the propriety of patronage-based employment decisions "has depended largely on the courts' juggling of competing constitutional and political values." *Upton v. Thompson*, 930 F.2d 1209, 1213 (7th Cir. 1991). For that reason, "it is difficult to imagine how any plaintiff ... could have a clearly established right to be free from patronage dismissal unless a nearly identical case had already been decided." *Pounds v. Griepenstroh*, 970 F.2d 338, 341 (7th Cir. 1992).

*Houlihan*, 871 F.3d at 546; *see also Riley,* 425 F.3d at 359 (providing a table of cases in which various political affiliations were held to be, and not to be, permissible qualifications).

Hoaks relies upon *Flenner v. Sheahan*, 107 F.3d 459 (7th Cir. 1997), to assert that a public official should not be given qualified immunity for terminating correctional officers. In *Flenner*, the court held that "an employee who performs primarily ministerial functions and who has little autonomy or discretion in performing his duties is not subject to patronage dismissal." *Id*. at 463. There, the sheriff argued that in 1993 an ambiguity

existed in the law which could lead a reasonable officer to conclude that Cook County correctional officers were subject to patronage dismissal as a matter of law, regardless of their job responsibilities. *Id*. The Seventh Circuit rejected this premise:

> [W]hile we focus on the inherent powers of the office rather than the individual who occupies it, it is impossible to generalize about the nature of an individual type of position, such as bailiff or secretary; job responsibilities can vary greatly between different governmental units or even within a governmental unit. For this reason the test under *Branti* must be applied to each individual office, and status under that formulation is left to the trier of fact to be determined.

*Id*. at 463–64 (citation omitted). The court noted that "[t]he indefiniteness of the applicable *Branti* standard has resulted in judicial confusion and inconsistency, a confusion that has naturally transpired to government officials having to apply *Branti*." *Id*. at 465 (quoting *Upton*, 930 F.2d at 1218). It recognized that because uncertainty exists within this range, "[a] plaintiff has little chance of winning a case of first impression unless she occupies an extremely high or low rung on the bureaucratic ladder." *Id*. (citation omitted). The Seventh Circuit considered the correctional officers' job descriptions and reversed the judgment on the pleadings, but noted that it was "possible that the position of Cook County correctional officer involves more discretion or autonomy than the government positions

involved in the cases cited and that the position of correctional officer is among those positions for which the propriety of patronage dismissal has not been clearly established. This is a determination which can be made by the district court only after it has developed the appropriate factual record." *Id*. at 465–66.

Defendants distinguish Hoaks from the correctional officers in *Flenner*, explaining that in *Flenner*, the correctional officers had no policymaking or decisionmaking authority and received daily instruction and immediate supervision regarding the handling, supervision and care of inmates. In contrast, Hoaks was a correctional officer in a small department with a wide degree of discretion in the manner in which to handle inmates. Hoaks testified that correctional officers did what they saw fit and what was necessary during their shifts. (Ex. A at 40.) He also testified that when he came to work, he would take care of what was needed to be taken care of, and that the sheriff only provided direction if they had transports or court. (*Id*.) The Court finds that, based on the evidence presented, a correctional officer position at Benton County Jail involves more than performing "primarily ministerial functions [with] little autonomy or discretion in performing his duties." *Flenner*, 107 F.3d at 643. Thus, it cannot be said that Hoaks' termination was an obvious violation of a constitutional right such that Munson should not

personally be protected by qualified immunity. Therefore, Defendants' motion for summary judgment on the issue of qualified immunity is granted, and the claim for damages asserted against Munson in his individual capacity is dismissed.

CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment (DE #31) is **GRANTED IN PART AND DENIED IN PART.** The Clerk is hereby **ORDERED** to **DISMISS** the claim for damages against Defendant Munson in his individual capacity **WITH PREJUDICE.**


DATED:  January 30, 2018           /s/ RUDY LOZANO, Judge
                                   United States District Court